UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| ALLAN F. WHITE, *et al.*, ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | No. 1:16-CV-332 |
| v. ) | |
| ) | Judge Curtis L. Collier |
| BRADLEY COUNTY GOVERNMENT, ) | |
| *et al.*, ) | |
| ) | |
| *Defendants.* ) | |

**M E M O R A N D U M**

Before the Court is Defendants' motion for summary judgment (Doc. 43) on Plaintiffs' claims under 42 U.S.C. § 1983 and Tennessee state law. Plaintiffs responded in opposition (Doc. 46), and Defendants replied (Doc. 50). For the reasons that follow, the Court will **GRANT IN PART** Defendant's motion for summary judgment (Doc. 43).

**I.    BACKGROUND**

Bradley County Tennessee police officer Tiffany Goodwin[1] ("Goodwin") returned home while on duty around 2:00 a.m. on July 28, 2015. (Doc. 46-16.) As she pulled into her driveway, she saw a man—later identified as Allan J. White III ("White")—squat behind a truck parked near her house. (Doc. 43-1 at 89-90.) Goodwin exited her vehicle, shined her flashlight towards the man, and yelled "Sheriff's office, show me your hands." (*Id*. at 93.) Rather than yield, White took off running towards the back of the house. Goodwin radioed dispatch from her portable radio, relaying her location and requesting backup. (*Id*. at 94.) Flashlight and Taser in hand, Goodwin gave chase.

---

[1] Tiffany Goodwin's last name was Oakley at the time this incident occurred.

She lost sight of White as he entered the woods behind her house. (*Id.*) Noting the direction he took, Goodwin cut through neighboring backyards, then veered left into the woods, aiming to cut off White's path. (*Id.* at 97-98.) As she crested an embankment, she found White laying facedown along a ditch, arms beneath him. (*Id.* at 104.) He faced the opposite direction, motionless.

Goodwin approached. She stated again, "Sheriff's office, show me your hands." (Doc. 46-16 at 3.) This prompted White to roll over, but Goodwin ordered him back onto his stomach with his hands behind his back. (Doc. 46-18 at 3.) Kneeling beside him, Goodwin cuffed White's right wrist with her free hand,[2] but White's left arm remained underneath him. After her orders to bring his left arm behind him were disregarded, Goodwin attempted to grab the arm. (Doc. 46-18 at 3.) This was met with resistance. White jerked his right arm away, rolled over, and rose to his feet. As White ripped his arm free, Goodwin pulled the trigger on the Taser. Whether she had actually hit him, though, was unclear. (Doc. 43-1 at 108.)

Undeterred, White threw Goodwin to the ground by her collar. (*Id.*) As he did, Goodwin fired the Taser a second time, though she was again unsure if she had made contact. (Doc. 43-1 at 123-24.) While Goodwin was on her back, White climbed atop her, facing the opposite direction. He put his knees on both of Goodwin's shoulders, effectively pinning her to the ground. (*Id.* at 110.) As the two grappled, White put his hands on Goodwin's face and neck, pushing down on her face, in what felt to Goodwin like an effort to choke her.[3] (*Id.* at 121.) With his right hand, White began to strike Goodwin's ribs on her side. (*Id.*)

---

[2] At this point, Goodwin had put away her flashlight and held the Taser in her left hand.

[3] Goodwin stated that she felt White's fingers in her mouth during the struggle. (Doc. 46-18 at 9.)

2

Case 1:16-cv-00332-CLC-SKL   Document 78   Filed 04/16/18   Page 2 of 10   PageID #: 682

Goodwin struggled beneath him. She attempted to push White off of her to no avail. Her orders to get off were disregarded. She attempted to access her radio, but it had been loosed from her shoulder during the altercation. (Doc. 46-16 at 4.) And she was entangled in the wires of the Taser she had dropped moments prior in her attempts to push White aside. (Doc. 46-18 at 3.) Fearing for her life, Goodwin grabbed her gun from its holster with her right hand. (Doc. 43-1 at 132.)

Goodwin pointed the gun up over her face, unsure of precisely where she was aiming, and pulled the trigger. (Doc. 43-1 at 132.) Still feeling White atop her, she fired at least once more.[4] (Doc. 46-16 at 7-8.) At that point, White removed himself from Goodwin, yelling "Ow, ow, okay, I'm done." (Doc. 43-1 at 133.) Goodwin rose, located her flashlight and radio, and informed dispatch that shots were fired. (Doc. 46-9.) She kept her gun trained on White, as he writhed on the ground, attempting to get up. (Doc. 43-1 at 133.) Goodwin ordered that he remain on the ground and continued asking who he was. (*Id*.) At some point, he responded, "I don't know you."[5] (*Id*.)

Shortly thereafter, backup units and emergency medical services ("EMS") arrived. EMS first transported White to SkyRidge Medical Center in Cleveland, Tennessee, then to Erlanger Medical Center in Chattanooga, Tennessee, where he eventually died from his injuries. (Doc. 46-9.)

---

[4] Goodwin expressed uncertainty as to how many times she fired her weapon. In her interview on the morning of the incident, Goodwin intimated she had fired twice but was unsure as to how many precisely. (Doc. 46-16 at 7-8.) In her deposition on November 15, 2017, she suggested there may have been three shots fired. (Doc. 46-19 at 140.) The autopsy revealed only two bullet wounds. (Doc. 46-11.) A third bullet casing was never found.

[5] During an interview, Goodwin stated she did not personally know White but did know of him from high school. (Doc. 46-18 at 12.) She denied ever having any type of relationship with him or ever engaging in any conversation with him, even in high school. (*Id*. at 13.)

3

White's mother and father ("Plaintiffs") filed suit on July 26, 2016, in the Circuit Court of Bradley County, Tennessee against Goodwin, the Bradley County Government, and Bradley County Sheriff Eric Watson. They brought claims under 42 U.S.C. § 1983 for use of excessive force in violation of the Fourth and Fourteenth Amendments. They also brought claims under Tennessee state law for wrongful death, negligence, gross negligence, and both negligent and intentional infliction of emotional distress, as well as claims under the Tennessee Governmental Tort Liability Act, T.C.A. § 29-20-101, *et seq.* (Doc. 1-1.) The case was removed to this Court on August 8, 2016. Defendants move for summary judgment on each of Plaintiffs' claims. (Doc. 43.)

## II.    STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the non-moving party. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). The non-moving party, however, "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). Should the non-moving party fail to provide evidence to support an essential element of its case, the movant can meet its burden by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). The court views the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

4

### III.     DISCUSSION

####    A.     Federal Claims: 42 U.S.C. § 1983

To state a claim under 42 U.S.C. § 1983, a plaintiff must "demonstrate that a person acting under color of state law deprived [him] of rights, privileges or immunities secured by the Constitution or laws of the United States." *Barker v. Goodrich*, 649 F.3d 428, 432 (6th Cir. 2011) (internal quotation marks omitted) (*citing Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)). Plaintiffs direct their § 1983 allegations at Goodwin, the Bradley County Government, and Sheriff Eric Watson.

#####        1.     Section 1983 Claim Against Goodwin

Pursuant to § 1983, Plaintiffs claim Goodwin used excessive force in violation of White's rights under the Fourth and Fourteenth Amendments.[6] Defendants submit that qualified immunity shields Goodwin from liability.

Under the doctrine of qualified immunity, governmental officials, including police officers, are insulated from civil liability as long as their conduct "does not violate clearly established statutory or constitutional rights which the reasonable officer in the defendant's position would have known." *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001). In evaluating a qualified immunity defense, the court undertakes a two-step analysis: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated,

---

[6] For analytical purposes, only the Fourth Amendment is implicated here. The United States Supreme Court has held that where a constitutional claim is covered by a specific constitutional provision, the claim must be analyzed under the standard appropriate to that specific provision, rather than under the rubric of substantive due process. *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997); *Graham v. Connor*, 490 U.S. 386, 394 (1989). Because apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment, the Court conducts its analysis pursuant to that provision. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

and if so, (2) whether that right was clearly established." *Ciminillo*, 434 F.3d at 466 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If the court finds no constitutional violation on the first prong, however, the inquiry ends there, as § 1983 is facially inapplicable in such an instance. *St. John v. Hickey*, 411 F.3d 762, 768 (6th Cir. 2005), *abrogation on other grounds recognized in Marvin v. City of Taylor*, 509 F.3d 234 (6th Cir. 2007). The first question the Court addresses, therefore, is whether Goodwin violated White's Fourth Amendment rights in her use of deadly force during their encounter.

To this end, the Court must ask "whether [Goodwin's] actions, in light of the totality of the circumstances, were objectively reasonable." *Kostrzewa*, 247 F.3d at 639. "[T]he specific facts of the case are key." *Id*. The Court "should pay particular attention to the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*.

Defendants argue Goodwin acted objectively reasonably throughout her encounter with White. They emphasize, in particular, that Goodwin used deadly force only as a last resort after her many demands were ignored and her previous attempts to subdue White were unsuccessful. Goodwin immediately identified herself when she first discovered White, ordering him to yield, which was refused; she pursued a fleeing suspect; she attempted to handcuff the suspect; and she fired her Taser when the suspect began to resist detainment. Only after White had begun to choke and strike Goodwin, Defendants note, did she then resort to deadly force.

Plaintiffs, however, submit that the use of deadly force to subdue a fleeing suspect was objectively *un*reasonable. Plaintiffs note that White was unarmed, and Goodwin never claimed she thought he was armed; Goodwin never saw White attempt to break into the vehicle in the driveway or the home itself; and White fled on foot, rather than speed away in a vehicle. Under

6

the circumstances, Plaintiffs suggest, Goodwin could not have reasonably believed White to be dangerous when she began her pursuit. Plaintiffs also submit that the danger in which Goodwin subsequently found herself was her own fault. They state Goodwin put herself in unnecessary peril by pursuing a man she knew was significantly larger than her instead of waiting for the requested backup, which would arrive in short time. Plaintiffs buttress these points with cases in which courts deemed lethal force excessive where it was brought to bear on unarmed suspects fleeing the scene, particularly where the officers and others in the immediate area were out of harm's way. *Garner*, 471 U.S. at 3–4 (finding excessive force where an officer shot a fleeing suspected burglar believed to be unarmed); *Smith v. Cupp*, 430 F.3d 766, 777 (6th Cir. 2005) (finding excessive force where the suspect, fleeing in a patrol car, was shot driving by the officers at the scene).

Plaintiffs' analysis misses the mark. White did flee initially, and Goodwin did pursue him. But Goodwin did not employ lethal force until White had pinned her on the ground and begun to fight her—not when White was fleeing from the house. The cases Plaintiffs cite, in contrast, deal only with suspects who were killed *while fleeing*; these cases are inapposite with respect to the circumstances before the Court.[7]

Defendants have the better argument. Goodwin happened upon White crouching behind a truck parked near her house in the middle of the night. She immediately identified herself and

---

[7] The Court also finds unpersuasive Plaintiffs' argument that Goodwin acted inappropriately in pursuing—without the aid of backup—someone who was physically larger than her, because she exposed herself to more risk in doing so. But a rule that officers act unreasonably anytime they pursue suspects bigger than themselves would render officer pursuit wholly unmanageable. Moreover, this point undercuts much of the premise on which Plaintiffs' Fourth Amendment claim is based. Plaintiffs repeatedly maintain that White was not dangerous when he fled the scene—he was unarmed and Goodwin had not observed him break in to any structures on the property. But if White indeed constituted no danger as Plaintiffs suggest, then Goodwin did not imperil herself by pursuing him. The Court finds these lines of argument unpersuasive.

ordered him to yield. Rather than comply, White sprinted behind the house towards the woods. Goodwin radioed for backup, pursued, and found White hiding in a ditch. She ordered he remain supine, hands behind his back, and approached. She then attempted to handcuff him. When White resisted and rose to his feet, Goodwin twice fired her Taser to no avail. White then threw her down, climbed onto her, and began to choke Goodwin and strike her ribs. Beneath White, Goodwin repeatedly demanded White remove himself, which was ignored, and struggled to push him aside, unsuccessfully. Only when Goodwin feared for her life did she resort to deadly force. Furthermore, Goodwin used no additional force once White had climbed off her, holding White at gunpoint until backup had arrived. Though Goodwin did not observe White commit a crime (beyond trespassing near her house in the middle of the night), White "actively resist[ed] arrest," "attempted to evade arrest by flight," and "pose[d] an immediate threat" to Goodwin as he assaulted her on the ground. *Kostrzewa*, 247 F.3d at 639.

As such, the Court finds Goodwin's conduct objectively reasonable. Because no constitutional violation occurred, the Court does not address whether a constitutional right was clearly established at the time. Accordingly, the Court dismisses Plaintiffs' § 1983 claim against Goodwin.

### 2. Section 1983 Claims Against Bradley County and Sheriff Watson

Plaintiffs further allege in their complaint that Bradley County's law enforcement policies and procedures worked a violation of White's constitutional rights. More specifically, Plaintiffs claim that Bradley County permitted, encouraged, and ratified a practice and custom of using excessive force; failed to enact proper procedures for disciplining officers who act inappropriately; failed to hire competent officers and train them properly; established a "code of silence" that

8

Case 1:16-cv-00332-CLC-SKL   Document 78   Filed 04/16/18   Page 8 of 10   PageID #: 688

discouraged the reporting of officer misconduct; and that Sheriff Watson allowed and cultivated a pattern within his department of constitutional rights violations.

In moving for summary judgment on these claims, Defendants describe Bradley County's police training procedures in detail, as well as Goodwin's personal qualifications, and note Plaintiffs' failure to point to any specific policy, practice, or custom they claim has led to constitutional violations or any type of officer misconduct. Plaintiffs, in turn, have made no substantive response to Defendants' arguments regarding Bradley County's policies and procedures, nor Sheriff Watson's alleged liability—in fact, Plaintiffs made no mention of these claims at all in their response to the motion before the Court (*see* Doc. 46). As a result, Plaintiffs have abandoned these claims. *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("A plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."). Accordingly, the Court will dismiss Plaintiffs' claims under § 1983 against the Bradley County Government and Sheriff Watson.

### B. State Law Claims

Plaintiffs also raise a number of claims under Tennessee state law. Brought in a federal-question case, these state law claims can only be heard by the Court through the exercise of supplemental jurisdiction pursuant to 28 U.S.C. § 1367. The exercise of federal supplemental jurisdiction is discretionary. District courts may decline to exercise supplemental jurisdiction over a state law claim if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or

9

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

"When all federal claims have been dismissed, the preferred disposition of state law claims is dismissal, or, where a case has come into federal court on removal, remand to state court." *Keller v. City of Cleveland, Tenn.*, No. 1:13-cv-91, 2014 WL 2809662, at *4 (E.D. Tenn. 2014) (citing *Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010)). "A federal district court should only exercise its discretion to retain supplemental jurisdiction after dismissing federal claims under limited circumstances, which frequently involve some degree of forum manipulation." *Id.* (citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988). Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. Because no federal claims remain in the instant action, the Court will remand this case to the Bradley County, Tennessee Circuit Court.

## IV. CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendant's motion for summary judgment (Doc. 43) as to Plaintiffs' claims under federal law. With only state law claims remaining, the Court will **REMAND** the case to the Bradley County, Tennessee Circuit Court for the disposition of Plaintiffs' remaining claims.

**An order shall enter.**

/s/
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**